IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AEROTEK AFFILIATED SERVICES, INC. | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. **3:25-CV-1455-L** |
| SCOTT GILMORE THOMPSON PLLC; MATT SCOTT; and JAMIE GILMORE, | § § § § | |
| Defendants. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Original Complaint ("Motion" or "Motion to Dismiss") (Doc. 16), filed July 25, 2025. For the reasons herein explained, the court **grants** the Motion to Dismiss.

**I.      Factual and Procedural Background**

Staffing company Aerotek Affiliated Services, Inc. ("Plaintiff" or "Aerotek") brought this action on June 6, 2025, against Scott Gilmore Thompson PLLC, Matt Scott, and Jamie Gilmore ("Defendants"), alleging that Defendants tortiously interfered with its employment contracts with Michael Marshall and Lerone Boyd. Specifically, Plaintiff alleges that Defendants, who provided legal representation to Mr. Marshall and Mr. Boyd in prior separate arbitrations against their employer Aerotek, interfered with and caused Mr. Marshall and Mr. Boyd to breach the confidentiality provisions in their respective employment contracts that provided as follows for confidential arbitration of employment disputes:

Confidentiality

The parties shall maintain the confidential nature of the arbitration proceeding and the award, including all disclosures in discovery, submissions to the arbitrator, the

**Memorandum Opinion and Order – Page 1**

hearing, and the contents of the arbitrator's award, except as may be necessary in connection with a court application for a provisional remedy under applicable law, a judicial action to vacate or enforce an award, or unless otherwise required by law or allowed by prior written consent of both parties. This provision shall not prevent either party from communicating with witnesses to the extent necessary to assist in arbitrating the proceeding. In all proceedings to confirm or vacate an award, the parties will cooperate in preserving the confidentiality of the arbitration proceeding and the award to the greatest extent allowed by applicable law.

Doc. 2-1 at 3.

Aerotek contends that Defendants willfully and intentionally interfered with the confidentiality provision in Mr. Marshall's contract by sending the arbitrator in the Boyd Arbitration a letter disclosing the contents of the Marshall Arbitrator's confidential Interim Award and enclosing a copy of the confidential Interim Award. Aerotek's claim for the alleged interference with Mr. Marshall's contract is set forth in Count I of Plaintiff's Complaint. Aerotek alleges that Defendants similarly interfered with the confidentiality provision in Mr. Boyd's contract by providing the Marshall Arbitrator a copy of the Boyd Arbitrator's proposed Interim Reasoned Award. Aerotek's claim for the alleged interference with Mr. Boyd's contract is set forth in Count II of Plaintiff's Complaint.

Aerotek further alleges that such conduct by Defendants was a "substantial factor" in bringing about: (1) its diminished recovery on its counterclaim in the Boyd Arbitration for Mr. Boyd's breach of the arbitration agreement (failure to arbitrate) and the resulting attorney's fees and costs that it incurred in moving to compel arbitration in state court; and (2) the monetary award against it on Mr. Marshall's hostile work environment claim in the Marshall Arbitration. In other words, Aerotek contends that its award of attorney's fees and costs in the Boyd Arbitration would have been higher, and Mr. Marshall's damage award in his arbitration against Aerotek would have been lower if Defendants, while acting as counsel for Mr. Boyd and Mr. Marshall, had not shared confidential arbitration award information with the arbitrators in both proceedings in violation of

**Memorandum Opinion and Order – Page 2**

the confidentiality arbitration provision in Mr. Boyd's and Mr. Marshall's employment contracts.[1]

With respect to its claim for tortious interference with Mr. Marshall's contract (Count I), Aerotek alleges that, "as reflected in the Boyd Arbitrator's Final Award dated September 11, 2023," it incurred "compensatory damages" in the amount of $388,400 as a result of Defendants' interference with the confidentiality provision in Mr. Marshall's contract. Doc. 1 at 15. The court notes that this amount appears to correspond to the amount of attorney's fees and costs that Aerotek sought in the Boyd Arbitration in connection with its counterclaim. Aerotek also seeks an additional $123,320 in attorney's fees and costs as "consequential damages" that it incurred in "a continuing effort to mitigate its damages by vacating the Boyd Arbitrator's award on [it]s counterclaim." *Id.*

With respect to its claim for tortious interference with Mr. Boyd's contract (Count II), Aerotek alleges that, "as reflected in the Marshall Arbitrator's Final Award dated July 10, 2023," it incurred "compensatory damages" in the amount of $530,930.92 as a result of Defendants' interference with the confidentiality provision in Mr. Boyd's contract. Doc. 1 at 17. This amount appears to correspond to the amount of damages awarded to Mr. Marshall on his hostile work environment claim in his arbitration against Aerotek. Aerotek also seeks an additional $155,264 in attorney's fees and costs as "consequential damages" that it incurred in "a continuing effort to mitigate its damages by vacating the Marshall Arbitrator's monetary award against [it] on Mr.

---

[1] In both arbitrations, Aerotek sought approximately $400,000 in attorney's fees and costs in connection with its counterclaims for breach of the arbitration agreements (failure to arbitrate) and the resulting attorney's fees and costs that it incurred in moving to compel arbitration in state court. Aerotek, however, was only awarded approximately $10,000 in nomimal damages in each arbitration to compensate it for the attorney's fees and costs it incurred. In both arbitrations, the arbitrators noted a lack of evidence supporting Aerotek's requests for attorney's fees and costs under Maryland law. In the Boyd Arbitration, after offsets, Mr. Boyd was awarded $10,000 on his hostile work environment claim, $96,037.55 in attorney's fees, $1080.36 in costs, as well as $225,000 in contingent appellate attorney's fees in the event further proceedings are necessary to enforce the arbitration award. *See* Doc. 2-10 at 12. In the Marshall Arbitration, after offsets, Mr. Marshall was awarded $200,000 in on his hostile work environment claim, $175,058.36 in attorney's fees, $1,080.32 for costs, $84,850.02 in prejudgment interest, and an additional $95,000 if appeals or a motion to enforce or vacate the arbitration award are filed. *See* Doc. 2-12 at 20.

**Memorandum Opinion and Order – Page 3**

Marshall's hostile work environment claim," which included an award of damages, attorney's fees, prejudgment interest, and contingent attorney's fees and costs. *Id.* In addition, Aerotek is seeking punitive damages against Defendants in connection with Counts I and II pursuant to Texas Civil Practice & Remedies Code § 41.003, prejudgment and postjudgment interest, and costs of court.

According to Aerotek's Complaint, the damages it seeks to recover in this action represent the amounts it lost in Mr. Boyd's and Mr. Marshall's arbitrations, as well as the attorney's fees and costs that it has incurred since the conclusion of the arbitrations in seeking to vacate the arbitration awards or opposing Mr. Boyd's and Mr. Marshall's efforts to confirm the arbitration awards. Aerotek notes that Mr. Boyd and Mr. Marshall both moved in state court to confirm their respective arbitration awards, and it moved to vacate the awards. After both arbitration awards were confirmed, Aerotek appealed.

On December 12, 2025, the court of appeals affirmed the Final Awards in both arbitrations. *See Aerotek Affiliated Servs., Inc. v. Boyd*, No. 05-24-00361-CV, 2025 WL 3619322, at *2-4 (Tex. App.—Dallas, 2025); *Aerotek Affiliated Servs., Inc. v. Marshall*, 2025 WL 3619321, at *6-7 (Tex. App.—Dallas, 2025). In both cases, the court of appeals applied essentially the same reasoning in concluding that counsel's disclosure of the Interim Awards in the Boyd and Marshall Arbitrations did not constitute the type of "fraud or corruption" necessary to establish that the arbitrators' awards were procured by undue means or fraud under the Federal Arbitration Act, 9 § U.S.C. 10(a)(1). *See id.* ("Aerotek has not shown that the disclosure violated any judicial or arbitral rules, and even if the lawyer violated a private confidentiality agreement, we conclude that his conduct amounted to nothing more than arguably overzealous lawyering.") (citing *UBS Fin. Servs., Inc. of P.R. v. Efron*, No. 23-13879, 2025 WL 1833578, at *9 (11th Cir. July 3, 2025) (per curiam) (holding that party did not use "undue means" when it informed arbitrators about prior arbitration

award that had later been vacated); *American Postal Workers Union v. United States Postal Serv.*, 52 F.3d 359, 362, 361-63 (D.C. Cir. 1995) (introducing claimant's arrest record during arbitration was not undue means even if using the arrest record violated Connecticut law); and *Trademark Remodeling, Inc. v. Rhines*, No. PWG-11-1733, 2012 WL 3239916, at *3 (D. Md. Aug. 6, 2012) (observing that no court has ever suggested that "undue means" reaches lawyer's acts that are merely legally objectionable, such as presenting confidential information)). In addition, the court of appeals concluded that Aerotek had failed to show a nexus between the alleged fraud or impropriety and the basis for the arbitrator's decision in the Marshall Arbitration. *Marshall*, 2025 WL 3619321, at *7.

Before the state appeals were resolved, Defendants moved to dismiss Plaintiff's tortious interference with contract claims in this action on two grounds, arguing that: (1) attorney immunity and the judicial proceedings privilege entitle them to total immunity from suit; and, alternatively, (2) the claims are barred by applicable statute of limitations.

## II.    Rule 12(b)(6) Legal Standard

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual

**Memorandum Opinion and Order – Page 5**

allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631

**Memorandum Opinion and Order – Page 6**

F.3d 777, 783 (5th Cir. 2011)  (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff.  *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002).  While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted).  Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions*.  R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim.  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  Stated another way:

> A motion to dismiss for failure to state a claim concerns the formal sufficiency of the statement of the claim for relief, not a lawsuit's merits. So when reviewing such a motion, we assume that the facts the complaint alleges are true and view those facts in the light most favorable to the plaintiff. The complaint survives if it contains sufficient factual matter ... to state a claim to relief that is plausible on its face.

*Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020) (citations and quotation marks omitted). Accordingly, the denial of a 12(b)(6) motion has no bearing as to whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge.

The grounds for dismissal raised by Defendants are affirmative defenses. "[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) (citation omitted); *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) ("A

**Memorandum Opinion and Order – Page 7**

statute of limitations may support dismissal under Rule 12(b)(6) whe[n] it is evident from a plaintiff's pleadings that the action is [time-]barred and the pleadings fail to set forth or raise some basis for tolling.") (citations omitted).

### III.    Discussion

#### A.  Statute of Limitations

In Texas, the statute of limitations for a claim for tortious interference with a contract is two years. *Cosgrove v. Cade*, 468 S.W.3d 32, 35 (Tex. 2015) (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a)). "The statute of limitations begins to run when a claim accrues," and "[a] cause of action accrues when facts come into existence that permit a plaintiff to recover." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019) (citations omitted); *Exxon Mobil Corp. v. Rincones,* 520 S.W.3d at 572, 591 (Tex. 2017) ("We have consistently stated that 'a cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy' and the 'fact that damage may continue to occur for an extended period after denial does not prevent limitations from starting to run.'") (citation omitted).

Applying this precedent, the Texas Supreme Court in *Rincones* held that "a claim for tortious interference with a contract accrues at the time a contracting party knows the nature of the injury and the damages[.]" 520 S.W.3d at 591 (citation omitted).  Applying a "when-facts-come-into-existence rule," the court in *Rincones* concluded that the plaintiff was not only aware of the defendant's alleged tortious interference, but he was also aware of the negative effects of such conduct:

> Facts came into existence authorizing Rincones to seek a judicial remedy on April 14, 2008, the day he was informed of his failed drug test and inactive status. ***On that day, he knew of the negative effects his inactive status would have on his job***: he would no longer receive income or assignments from WHM [Custom Services, Inc.] unless he followed procedures to regain active status. Rincones's tortious-interference claim is barred because he did not bring it until more than two

years after the accrual date, April 14, 2008. TEX. CIV. PRAC. & REM. CODE § 16.003(a). Even if he may have continued to suffer damages after that date, his claim is time-barred as a matter of law.

*Rincones*, 520 S.W.3d at 592 (emphasis added).

Here, Defendants contend that Plaintiff's claims for tortious interference with a contract are barred because Aerotek alleges that they interfered with Mr. Marshall's and Mr. Boyd's contracts on April 28, 2023, and May 25, 2023—the dates that Defendants provided the Boyd and Marshall Arbitrators with the confidential Interim Award information—but Aerotek did not file this action until June 6, 2025, more than two years after the dates it became aware of the alleged interference.

Plaintiff disagrees and contends that it did not sustain "actual damage" until after the Final Awards were entered in the arbitrations on July 10, 2023, and September 11, 2023. Plaintiff further asserts that the Interim Awards that issued on May 25, 2023, and June 6, 2023, were subject to change and incapable of being enforced.

The first Interim Award in the Boyd Arbitration issued on April 11, 2023. This first Interim Award merely stated that both parties had prevailed on their respective claims without stating any amounts that would be awarded. The second Interim Award that issued on June 6, 2023, however, included the damage awards for both Mr. Boyd and Aerotek, and stated that all that remained for consideration was the amount of attorney's fees and costs to be awarded to Mr. Boyd as the prevailing party in the arbitration. Thus, this is the first time that Aerotek could have known of the allegedly negative effects of Defendants' interference. As suit was brought by Aerotek on June 6, 2025, with respect to Defendant's alleged interference with Mr. Marshall's contract as it pertains to the Boyd Arbitration, its claim in this regard (Count I) was filed within the applicable two-year-

limitations period and is not time-barred.  Accordingly, Defendants are not entitled to dismissal of Count I on this ground.

The Interim Award in the Marshall Arbitration issued on May 25, 2023.  This Interim Award stated that Mr. Marshall was entitled to recover damages of $210,000 or $200,000 after an offset of $10,000 for the attorney's fees awarded to Aerotek as contract damages.  The Interim Award made clear that it "resolve[d] all issues submitted for determination in this arbitration proceeding, except [Mr.] Marshall's attorneys' fees[.]"  Doc. 2-6 at 17.  The Final Award in the Marshall Arbitration did not change or increase the amount of damages awarded to Mr. Marshall, which is the basis for Plaintiff's Count II,  but even if it had, Aerotek first became aware of the allegedly negative effects of Defendants' interference (the damages awarded to Mr. Marshall) on May 25, 2023.  As Plaintiff did not file this action and assert Count II until June 6, 2025, more than two years after this date, its claim for Defendants' allegedly tortious interference with Mr. Boyd's contract (Count II) is time-barred and will be dismissed with prejudice.

**B.  Attorney Immunity**

Defendants contend that Plaintiff's claims for tortious interference with Mr. Marshall's and Mr. Boyd's contracts are also barred by attorney immunity under Texas law because their arbitration filings and communications with the arbitrators that form the basis for Plaintiff's claims: (1) "[were] made within the scope of arbitration and (2) constituted legal advocacy that lawyers normally engage in as a part of their zealous representation—. . . [to] encourage the arbitrators to find in favor of their clients on liability and damages." Doc. 16 at 8. According to Defendants their alleged "tortious interference" is inseparable from their zealous advocacy that they provided on behalf of their clients in the arbitration proceedings. Defendants, therefore, argue that they are fully immunized because their sharing the interim awards with the arbitrators "for the

**Memorandum Opinion and Order – Page 10**

sole purpose of promoting the arguments and credibility of their clients" is precisely "the kind of conduct in which an attorney engages when discharging his duties to his client." *Id.* (quoting *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 348 (5th Cir. 2016).

Plaintiff counters in pertinent part as follows:

> Defendants must be arguing that the act of causing Client A to breach Client A's arbitration agreement fell within the scope of their representation of Client B, in Client B's arbitration proceeding and for Client B's benefit. However, such disregard of Client A's contractual obligations and best interest is foreign to the duties of an attorney.

> In *Moore v. Anson Fin., Inc.*, No. 02-19-00201-CV, 2020 WL 1293695 (Tex. App.—Fort Worth April 20, 2020), the court referred to the Texas Disciplinary Rules of Professional Conduct when determining whether certain conduct was the kind of thing an attorney would do in representing a client. *Id.* at *4 (finding that "conferring with a client before taking on additional representations . . . serves the lawyer's duty to communicate with the client [under Tex. Disciplinary Rules Prof'l Conduct 1.03]."). These rules prohibit an attorney from revealing a client's confidential information, using such information to the client's disadvantage without consent, and representing a client whose interest is materially adverse to that of another client. Tex. Disciplinary Rules Prof'l Conduct 1.05(b), 1.06. The point is not that the rules suggest Defendants' conduct was "wrongful," but only that it could not have been among the "duties of an attorney" when the rules create contrary duties.

> "[T]he public interest is served by the enforcement of valid contracts." *HealthTrackRX v. Samaha*, No. 24-CV-1100-SDJ, 2020 WL 1293695, *7 (E.D. Tex. July 25, 2025). That interest must be weighed against an advocate's right to a degree of immunity. There can be no serious contention that "zealous advocacy" on behalf of Client B allows an attorney to violate Client A's contractual obligation to maintain the confidentiality of an arbitration proceeding, a settlement, or something else Client A agreed to keep confidential. Indeed, if an attorney representing Client B could benefit Client B by disclosing the confidential information of Client A, and was immune from liability for doing so, the attorney would not only be allowed to breach the confidential information of Client A—but would be required to. In that world, lawyers could not be sued (even by Client A) for violating Client A's confidentiality obligations, but could be sued by Client B if the lawyer failed to violate another client's (Client A's) confidentiality obligations.

**Memorandum Opinion and Order – Page 11**

Doc. 19 at 7 (footnote omitted).  According to Plaintiff, the "perverse result advocated by Defendants would effectively vitiate confidentiality agreements in the State of Texas," but "[f]ortunately, it is not required by the case law and does not support Defendants' Motion." *Id.*

For the reasons that follow, the court disagrees with Plaintiff's unsupported characterization of Texas law with respect to the application of attorney immunity to the facts of this case as alleged in Plaintiff's Complaint. In *Ironshore Europe DAC v. Schiff Hardin*, LLP, 912 F.3d 759 (5th Cir. 2019), the Fifth Circuit summarized the Texas Supreme Court's holdings regarding the scope and applications of the attorney privilege in *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015), and *Youngkin v. Hines*, 546 S.W.3d 675 (Tex. 2018), as follows:

> In *Cantey Hanger*, the court described this doctrine as "intended to ensure 'loyal, faithful, and aggressive representation by attorneys employed as advocates'" by avoiding "the inevitable conflict that would arise if [they] were 'forced constantly to balance [their] own potential exposure against [their] client's best interest.'"
>
> The *Cantey Hanger* court made it clear that attorneys are generally "immune from civil liability to non-clients 'for actions taken in connection with representing a client in litigation.'" Attorney immunity does not extend to actions that "do not qualify as 'the kind of conduct in which an attorney engages when discharging his duties to his client'" or that "are entirely foreign to the duties of an attorney" because they do "not involve the provision of legal services and would thus fall outside the scope of client representation." However, this immunity extends to even wrongful conduct that is "part of the discharge of the lawyer's duties in representing his or her client." The *Cantey Hanger* court declined to find a general fraud exception to the doctrine of immunity, reasoning that "the focus in evaluating attorney liability to a nonclient is 'on the kind—not the nature—of the attorney's conduct,'" so "[m]erely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'"
>
> In *Cantey Hanger*, the plaintiffs alleged that an attorney made intentional misrepresentations in the "preparation of a bill of sale [transferring] an airplane awarded to [the firm's] client in an agreed divorce decree," for the purpose of shifting tax liability between the parties to the divorce in violation of the decree. The court reasoned that the preparation of the bill of sale to facilitate the transfer of the airplane pursuant to the decree "'was conduct in which an attorney engages to discharge his duties to his client' and was not 'foreign to the duties of an attorney.'"

**Memorandum Opinion and Order – Page 12**

It found that the additional allegations about the intentional misrepresentations to shift tax liability did not bring the conduct outside the scope of the firm's duties to its client.

. . . .

In April 2018, the Supreme Court of Texas reaffirmed in *Youngkin* that *Cantey Hanger* "controls [its] analysis of attorney immunity" and summarized the *Cantey Hanger* rule as follows: "[A]n attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer," which "inquiry correctly focuses on the kind of conduct at issue rather than the alleged wrongfulness of said conduct." The court noted that "[t]he only facts required to support an attorney-immunity defense are the type of conduct at issue and the existence of an attorney-client relationship at the time."

In *Youngkin*, the plaintiff alleged that the attorney knowingly participated in a fraudulent scheme to deprive the plaintiff of property by entering a settlement agreement on his clients' behalf "knowing they had no intention to comply," helping his clients avoid compliance by preparing a deed used to transfer the property to another person, and aiding that person in his efforts to wrongfully assert ownership of the property. The court noted that it was required, under *Cantey Hanger*, to "look beyond [the plaintiff's] characterizations of activity as fraudulent and conspiratorial and focus on the conduct at issue," which it described as "negotiating and entering a settlement agreement, preparing transfer documents, and filing a lawsuit." The court found that this "conduct was directly within the scope of [the lawyer's] representation of his clients, regardless of any disagreement over the substance of the settlement agreement" and was "not foreign to the duties of a lawyer."

*Ironshore Europe DAC*, 912 F.3d at 764-66) (citing *Cantey Hanger, LLP*, 467 S.W.3d at 481-85;

and *Youngkin*, 546 S.W.3d at 678-89) (footnotes and other citations omitted).

Thus, in sum, the Fifth Circuit determined that, under Texas law:

Whether an attorney's conduct was in the scope of his representation of a client is a legal question. Attorney immunity applies to all "actions taken in connection with representing a client in litigation," even wrongful conduct that is "part of the discharge of the lawyer's duties in representing his or her client," as long as it is not "entirely foreign to the duties of an attorney." For this analysis, the Supreme Court of Texas has repeatedly instructed courts to simply look to the general kind of conduct at issue and whether attorneys engage in that kind of conduct when discharging duties to a client.

*Ironshore Europe DAC*, 912 F.3d at 767) (citing *Cantey Hanger, LLP*, 467 S.W.3d at 481-82; and

*Youngkin*, 546 S.W.3d at 683) (footnotes and other citations omitted).

**Memorandum Opinion and Order – Page 13**

Applying the reasoning in *Cantey Hanger* and *Youngkin* to the facts as pleaded by the plaintiff, the court in *Ironshore Europe DAC* concluded that the district court erred in determining that Texas's attorney immunity did not apply to the plaintiff's negligent misrepresentation claims and Schiff Hardin's attorney immunity defense: "The *Cantey Hanger* court's rejection of the argument that attorney immunity does not extend to fraudulent and other intentional conduct committed by the attorney in the course of representing his client makes it clear to us that the Supreme Court of Texas would extend immunity to the much less egregious conduct of negligent misrepresentation, whether or not the non-client relied on the negligent misrepresentation." *Ironshore Europe DAC*, 912 F.3d at 766.

In this regard, the *Ironshore Europe DAC* court reasoned that the facts alleged by the plaintiff reflect that the alleged conduct (Schiff Hardin's alleged misrepresentations and omissions) all related to its representation of its client in litigation notwithstanding the plaintiff's contentions to the contrary and focus on the alleged wrongfulness of such conduct:

> The factual allegations of the complaint in this case reflect that all of the alleged misrepresentations and omissions were related to Schiff Hardin's representation of Dorel in the Hinson litigation. Looking beyond Ironshore's characterization of the firm's conduct as wrongful, as we must, the type of conduct at issue in this case includes: (1) reporting on the status of litigation and settlement discussions; (2) providing opinions as to the strength and valuation of plaintiffs' claims; (3) providing opinions as to the perceived litigation strategies employed by opposing counsel and the potential prejudice of pre-trial developments; (4) providing estimates of potential liability; (5) reporting on the progress of a jury trial; and (6) reporting on pre-trial rulings and pre-trial settlement offers.
>
> We are satisfied that the kinds of conduct at issue in this case fall within the routine conduct attorneys engage in when handling this type of litigation. Schiff Hardin's conduct falls squarely within the scope of the firm's representation of its client. This court is "not bound to accept as true [plaintiff's] legal conclusion" that the misrepresentations were somehow "separate from [Schiff's] representation and defense of Dorel" and "not necessary to, nor a part of, Schiff's defense of Dorel in the Lawsuit." Immunity is established on the face of the complaint, which alleges only misrepresentations and omissions related to the Hinson litigation, in which Schiff Hardin undisputedly represented Ironshore's insured Dorel in the defense of

**Memorandum Opinion and Order – Page 14**

a products liability case. Schiff Hardin's first duty was to its client, Dorel, and it was up to Ironshore to retain its own counsel if it was dissatisfied with the comprehensiveness of the information it was receiving from its insured's attorneys. Therefore, we find that the requirements for attorney immunity are met, Schiff Hardin's Rule 12(b)(6) motion to dismiss should be granted, and the plaintiff's complaint should be dismissed.

*Ironshore Europe DAC*, 912 F.3d at 767 (citations omitted).

The same reasoning applies with equal force here. Plaintiff's claims for tortious interference with contracts stem from Defendants' conduct while representing Mr. Boyd and Mr. Marshall in their respective arbitration proceedings against Aerotek. Their conduct involved submitting materials and information to the arbitrators in an effort to obtain favorable rulings on behalf of their clients. Such conduct constitutes routine conduct that attorneys engage in when handling this type of litigation and falls squarely within the scope of Defendants' representation of their clients in the arbitrations against Aerotek. *See id*.

Aerotek's reliance on *Moore v. Anson Financial, Incorporated* in an attempt to distinguish Defendants' conduct in this case from the kind of conduct that an attorney or law firm normally engages in when discharging his or her duties to a client is misplaced, as the *Moore* court rejected arguments similar to those asserted here by Aerotek concerning Defendants' handling of their clients' confidential information and concluded that the attorney privilege applied. *See Moore*, 2020 WL 1293695, at *4-5) (citing *Cantey Hanger*, 467 S.W.3d at 482 ("If an attorney's conduct violates his professional responsibility, the remedy is public, not private."); and *Blankinship v. Brown*, 399 S.W.3d 303, 311 (Tex. App.—Dallas 2013, pet. denied) ("The Texas Disciplinary Rules of Professional Conduct expressly state that a violation of the Code of Professional Responsibility does not give rise to a private cause of action.")) (other citations omitted). Further, the *Cantey Hanger* court noted that, even if an attorney's conduct in representing his or her clients is wrongful, there are "other mechanisms are in place to discourage and remedy such conduct,

**Memorandum Opinion and Order – Page 15**

such as sanctions, contempt, and attorney disciplinary proceedings." *Cantey Hanger*, 467 S.W.3d at 482 (citations omitted).  Thus, contrary to Aerotek's assertion, conduct that violates the Texas Disciplinary Rules of Professional Conduct does not preclude a finding that an attorney is "immune from civil liability to non-clients 'for actions taken in connection with representing a client in litigation.'" *Id.* at 481 (citations omitted).

It is also undisputed that the type of conduct that Defendants engaged in did not involve, for example, "assaulting opposing counsel during trial," which has been held to fall outside the scope of client representation.  *Id.* at 482 (citations omitted).  Likewise, even assuming as Aerotek alleges that Defendants' conduct in disclosing the confidential arbitration awards to the arbitrators caused their clients to breach their employment contracts with Aerotek, the allegations in Plaintiffs' Complaint make clear this conduct occurred in the context of the arbitration proceedings, and that Defendants did so in an effort to benefit their clients or give them an advantage in their respective arbitrations. For Aerotek to now claim otherwise in response to Defendants' Motion to Dismiss contradicts its pleadings that Defendants' conduct benefited Mr. Marshall and Mr. Boyd to Aerotek's detriment by increasing Mr. Marshall's damages award on his hostile work environment claim against Aerotek and reducing the amount of attorney's fees that Mr. Boyd was required to pay Aerotek in connection with its counterclaim.  Zealous advocacy such as this by Defendants in the arbitrations on behalf of their clients is precisely the type of attorney conduct to which Texas's attorney privilege is meant to apply and protect.

The court, therefore, determines that the requirements for attorney immunity are established on the face of Plaintiff's pleadings. Moreover, given the Texas Supreme Court's determination that attorney immunity extends to fraudulent and other intentional conduct committed by the attorney in the course of representing his client, the court determines that the

**Memorandum Opinion and Order – Page 16**

Supreme Court of Texas would extend immunity to the conduct alleged by Aerotek in this case concerning Defendants' allegedly tortious interference with their clients' employment contracts with Aerotek, even though Aerotek alleges that such conduct was intentional and willful. *See Ironshore Europe DAC*, 912 F.3d at 766. Accordingly, Defendants are entitled to dismissal of both of Plaintiffs' claims for tortious interference with a contract on this ground, and such claims will be dismissed with prejudice.

### C. Judicial Proceedings Privilege

Having determined that Plaintiff's claims fail for the reasons already explained, the court need not address the parties' contentions regarding the applicability of the judicial proceedings privilege to this case.

## IV. Conclusion

For the reasons stated, Defendants' Motion to Dismiss (Doc. 16) is **granted**, and Plaintiff's claims for tortious interference with a contract are **dismissed with prejudice**. The court, as required by Federal Rule of Civil Procedure 58, will issue a judgment by a separate document.

**It is so ordered** this 17th day of March, 2026.

Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order – Page 17**